UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Sharon Lindsay as Administratrix of the Estate of Gloria M. Parkin,<br>*Plaintiff,*<br>v.<br>Mark C. Clemm, Katie M. Clemm, and Clemm and Associates LLC,<br>*Defendants.* | Civil Action No.<br><br>**Jury Trial Demanded** |

# COMPLAINT

### I. INTRODUCTION

1. Plaintiff Sharon Lindsay as Administratrix of the Estate of Gloria M. Parkin brings this action to collect monies paid to businesses controlled by Defendants Mark Clemm and Katie Clemm as part of their illegal association-in-fact enterprise that has made and collected upon predatory mortgage loans that charged and collected interest at over twice the legal rate in Pennsylvania, in violation of the federal Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1962(c) and (d) and the Pennsylvania Fair Credit Uniformity and Extension Act, 73 Pa. Stat. Ann. 2270.1 *et seq.*

2. Defendants Mark and Katie Clemm are classic loan sharks who operate a closely-held series of shell companies for the purpose of making usurious and predatory loans in violation of Pennsylvania law, obtaining residential mortgages on the basis of those loans, and then using the threat of mortgage foreclosures to coerce victims to pay unlawful interest rates. They use their law firm, Defendant Clemm and Associates LLC, to attempt to enforce these illegal loans.

3. Defendants falsely characterize these loans as "business" loans in transaction documents in an effort evade interest caps, consumer credit disclosure obligations, pre-foreclosure notice requirements and other consumer protection laws.

1

4. The terms of these loans are usurious and predatory. Besides charging over double the legal interest rate, the loans are non-amortizing, interest-only loans containing unaffordable balloon payments due at the end of the loan term. Moreover, under the terms of the loan, paying down the principal is *prohibited*, unless payments were made in amounts greater than $10,000. When the terms of the loan come due and the borrowers are unable to make the balloon payments, Defendants, through their RICO enterprise comprised of several closely-held shell companies, "renew" the loan to ensure the continuing stream of usurious interest payments. If the borrower refuses, Defendants move to foreclose on the residential properties, switching their roles from that of creditors to foreclosure attorneys.

5. Defendants' knowing creation and continuous employment of a constellation of related business entities for predatory and coercive loan sharking is the sort of organized use of legitimate business structures to conduct illegal activities which the RICO Act and the civil cause of action thereunder were designed to prevent.

6. Ms. Gloria M. Parkin, now deceased, was a victim of Defendants' unlawful debt collections through a usurious loan, originally made to her son Dwayne Steers (who had no business purpose for the loan), which was secured on her residential property. Defendants collected thousands of dollars of illegal interest on the loan from Ms. Parkin until she died in 2023.

7. Plaintiff Sharon Lindsay, acting as Administratrix of the Estate of Gloria M. Parkin, brings this action to recover as actual damages amounts paid to Defendants by Ms. Parkin within the relevant limitation periods governing, respectively, her federal RICO claim and her state debt-collection claim. Plaintiff also seeks trebling of damages and attorneys' fees and costs, as provided by the applicable statutes.

## II. THE PARTIES

### A. Plaintiff

8. Plaintiff Sharon Lindsay is the Administratrix of the Estate of Gloria M. Parkin and represents the Estate in this matter. Ms. Parkin died in October 2023 and resided in Philadelphia, Pennsylvania at the time of her passing. Ms. Lindsay, who is one of her children, was appointed Administratrix of Ms. Parkin's Estate in December 2023 pursuant to Letters of Administration issued by the Register of Wills of Philadelphia County, Pennsylvania.

### B. Defendants

9. Defendant Mark C. Clemm is an individual and a Pennsylvania-licensed attorney who resides in Blue Bell, Pennsylvania and whose business office is in Blue Bell, Pennsylvania.

10. Defendant Katie M. Clemm is an individual and a Pennsylvania-licensed attorney who currently resides in Charlotte, North Carolina and whose business office is in Blue Bell, Pennsylvania. At the time of the conduct complained of, Defendant Katie Clemm resided in either Philadelphia County or Montgomery County, Pennsylvania.

11. Clemm and Associates LLC is a law firm that is registered as a restricted professional limited liability company with a registered address of 488 Norristown Rd., Suite 140, Blue Bell, PA 19422. The prior address of Defendant Mark Clemm's law firm, whether operating as Clemm and Associates or under a different name, was 527 Plymouth Rd., Suite 416, Plymouth Meeting, PA 19462.

### C. Non-Party Enterprise Entities

12. WCT LLC is registered as a domestic limited liability company with a registered address of 488 Norristown Rd., Suite 140, Blue Bell, PA 19422.

13. KMC Associates LLC is registered as a domestic limited liability company with a registered address of 488 Norristown Rd., Suite 140, Blue Bell, PA 19422.

14. MCC Associates LLC is registered as a domestic limited liability company with a registered address of 488 Norristown Rd., Suite 140, Blue Bell, PA 19422.

15. MCPSP LLC is registered as a domestic limited liability company with a registered address of 527 Plymouth Rd., Suite 416, Plymouth Meeting, PA 19462.

16. M&M Associates is an unincorporated association whose only publicly identified business address is 527 Plymouth Rd., Suite 416, Plymouth Meeting, PA 19462.

### III. JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over this dispute pursuant to RICO, 18 U.S.C. § 1965. This Court also has federal question jurisdiction under 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claim as part of the same case or controversy under 28 U.S.C. § 1367.

18. This Court has personal jurisdiction over the Defendants because Defendants' activities that give rise to the claims in this action have been directed at and in the Commonwealth of Pennsylvania, conducted both directly and through their agents or alter egos, and because a substantial part of Plaintiff's claims occurred in this District. The Court also has general personal jurisdiction over the Defendants because both Defendants resided in this District at the time of the conduct complained of. This Court also has personal jurisdiction over Defendants under 18 U.S.C. § 1965.

19. Venue is proper in this district pursuant to 18 U.S.C. § 1965(a)—which provides for venue in any district in which a RICO defendant transacts his affairs—and 28 U.S.C. § 1391(b), in that a substantial part of the events giving rise to Plaintiffs' claims occurred in this district and the defendants are subject to personal jurisdiction in this district.

IV.    **FACTUAL ALLEGATIONS**

    A.  <u>**The Clemms' Usurious Lending Enterprise**</u>

20.     Defendants Mark and Katie Clemm are owners, principals, agents and operators of a number of entities which operate as an association-in-fact RICO enterprise, whose principal business is the making of usurious loans secured by residential mortgages, collections upon the loans coerced by threat of foreclosure, and bringing foreclosure actions to recoup the expected losses from predatory lending to consumer borrowers with no ability to repay loans with usurious rates and onerous terms including balloon payments.

21.     The Clemms' Usurious Lending Enterprise is an association-in-fact enterprise under RICO which includes the individual Defendants Mark and Katie Clemm, and, at the very least, the business entitles Clemm and Associates LLC, WCT LLC, and KMC Associates LLC. The Enterprise may also include other Clemm entities, such as MCC Associates, WCT Associates LLC, MCPSP LLC, and M&M Associates.

22.     All of the above-mentioned entities were registered with the Pennsylvania Secretary of State at the current or past address of Defendants' law firm, Clemm and Associates LLC, which is Defendant Mark and Katie Clemm's principal business address.

23.     Over the past twenty years, Defendants Mark and Katie Clemm have recorded over fifteen mortgages in Philadelphia, Bucks, and Montgomery Counties on behalf of the closely-held entities that make up the Clemms' Usurious Lending Enterprise.

24.     Over the past twenty years, Defendants Mark and Katie Clemm have brought at least six foreclosure actions related to such mortgages in Philadelphia, Bucks, and Montgomery Counties on behalf of the closely-held entities that make up the Clemms' Usurious Lending Enterprise.

25. Defendants Mark and Katie Clemm are the owners, operators, managers, principals, and agents of the entities that make up the Clemms' Usurious Lending Enterprise, and they have complete control over the entities.

26. Defendants Mark and Katie Clemm draft, sign, and act as principal point of contact for all lending documents used by the entities in the Clemms' Usurious Lending Enteprise.

27. Defendants Mark and Katie Clemm oversee and manage all operations related to the servicing of loans made by the entities in the Clemms' Usurious Lending Enteprise, including billing, collecting, and foreclosing on the loans.

28. Defendants Mark and Katie Clemm operate and conduct the Clemms' Usurious Lending Enterprise out of their shared law offices of Clemm and Associates LLC.

29. Defendants Mark and Katie Clemm also act as lawyers on behalf of the entities that make up the Clemms' Usurious Lending Enterprise and regularly represent the entities in litigation, including the foreclosure actions, as part of their scheme to hide their unlawful activities from outside counsel with independent ethical obligations.

30. The various business entities are actually alter egos of Defendants Mark and Katie Clemm that they use for the principal purpose of making and collecting on usurious loans, the profits of which accrue to Defendants Mark and Katie Clemm personally.

31. Defendants Mark and Katie Clemm use the variety of entities in an effort to paper the Clemms' Usurious Lending Enterprise with the appearance of legitimacy and arms-length dealings in order to better conceal their illegal activities.

32. Defendants Mark and Katie Clemm also use the variety of entities in an effort to distribute and compartmentalize risk and liability should they be held to account for their illegal activities.

33. Defendants Mark and Katie Clemm, as part of the scheme, assign the mortgages among the various entities in order to create the false appearance of distance between the persons who would be the principal fact witnesses in a foreclosure action and the attorneys representing the Clemms' Usurious Lending Enterprise in the action.

34. For example, in the foreclosure action filed related to Ms. Parkin's home, the loan which was initially made by WCT at the direction of Defendant Mark Clemm, was later assigned to KMC Associates, of which Defendant Katie Clemm is the sole and managing member, in order for Defendant Katie Clemm to be able to represent KMC Associates's effort to foreclose the mortgage while still having plausible deniability as to the underlying facts related to illegal formation of the loan, known directly by her father and co-conspirator Defendant Mark Clemm.

35. Although Defendants Mark and Katie Clemm utilize all of these entities as part of the Clemms' Usurious Lending Enterprise to make, collect upon, and foreclose upon usurious mortgages, the corporate entities which they operated in combination to the detriment of Ms. Parkins are the lending entities WCT LCC and KMC Associates LLC, as well as the law firm Clemm and Associates, LLC.

**B. Defendants' Usurious Collections Against Ms. Parkins**

36. At the time of her death, Ms. Parkin was an 86-year old, low-income, elderly immigrant, living on a fixed income. She was unsophisticated with respect to consumer and financial matters.

37. Ms. Parkin resided in and owned her home located at 8527 Michener Avenue, Philadelphia, PA 19150.

38. Ms. Parkin is the mother of Dwayne Steers.

39. In 2012, Mr. Steers's wife, son, father, and father-in-law all passed away within a matter of months. Mr. Steers, desperate for money to move to Florida and start a new life, sought

out a personal loan via the financial section on Craigslist, where he found an advertisement offering loans to individuals that owned homes.

40. Mr. Steers contacted the number on the advertisement and spoke with a loan broker named William Catanese, who referred Mr. Steers to Defendant Mark Clemm.

41. Mr. Clemm, on behalf of his lending entity WCT, LLC, agreed to lend Mr. Steers $60,000 for five years, but only if that loan was secured by a mortgage against Ms. Parkin's home.

42. Mr. Clemm never requested any documentation about any business or trade carried out by Mr. Steers, and he never requested any business proposal or any information about any proposed business purpose the loan.

43. Mr. Clemm never had Mr. Steers sign an affidavit, under penalty of perjury, setting forth that the proceeds of the loan were intended for the use in a business, as required for business loans under 10 Pa. Code § 7.2.

44. What Clemm did require, however, was that the loan pay off any liens on the Parkins home.

45. Clemm drafted a collection of documents to make and secure the loan, including a Promissory Note signed by Mr. Steers, as well as a Mortgage and a Guaranty and Surety Agreement signed by Ms. Parkin. These three instruments, together with the Settlement Statement that summarizes how the $60,000 loan was disbursed, will be referred to collectively as "the Loan."

46. A loan closing took place at Clemm's law firm on December 11, 2013. According to the Settlement Statement prepared by the closing agent arranged by Clemm, Mr. Steers only received $36,405 in proceeds from the $60,000 loan. The remainder of the proceeds went to paying off two supposed judgments and numerous fees and charges imposed by Clemm and the closing agent.

47. Included in the settlement charges taken off the top of the loan proceeds were the following:

a. An $1,800 "origination fee" that was disbursed to Clemm personally;

b. An $1,800 broker fee paid to Catanese;

c. A $1,200 fee to Clemm's law firm for preparing the documents;

d. $10,000 to pay off a supposed judgment lien on the Parkin property that, in reality had already been paid years earlier;

e. $5,000 designated as a "tax escrow" that was paid to WCT, but, on information and belief, was never paid to any taxing authority; and

f. $427.40 in precomputed interest that was also paid to WCT.

48. The Loan contained multiple illegal and predatory terms, including an interest rate substantially in excess of the maximum lawful rate.

49. The Loan was a "residential mortgage" under the Pennsylvania interest law because it reflected an obligation to pay a sum of money less than the base figure of $234,692, *see* 42 Pa.B. 6899 (Nov. 3, 2012), secured by a lien upon a residential property in Pennsylvania of two units or less. 41 Pa. Stat. Ann. § 101.

50. 41 Pa. Stat. Ann. § 301(b) establishes a flexible maximum lawful interest rate for residential mortgages determined by the Monthly Index of Long-Term United States Government Bond Yields for the second preceding calendar month plus an additional two and one-half percent per annum rounded off to the nearest quarter of one per cent per annum.

51. The legal rate of interest for a loan secured by a residential mortgage in Pennsylvania at the time the Loan was made on December 11, 2013 was a 5.75% APR. *See* 43 Pa. B. 6807 (Nov. 16, 2013).

52. According to the loan documents, the interest rate charged Ms. Parkin and Mr. Steers was 13%—more than twice the legal rate of 5.75%—but the actual rate was more like 19.6%, when accounting for the above-mentioned fees and charges that Clemm skimmed from the $60,000

loan. That is because, under Pennsylvania's interest law, the interest ceiling applicable to residential mortgages is based on an "original *bona fide* principal amount," 41 Pa. Stat. Ann. § 101 (definition of "residential mortgage") (emphasis added), as opposed to the stated principal.

53. The bona fide principal amount of the Loan—*i.e.*, after deducting the so-called "settlement charges" referenced above that were paid out of the loan disbursements—was $39,773.

54. The Loan was also an interest-only loan, meaning that the payments were never applied to principal and the balance never declined, with a balloon payment of $60,000—*i.e.*, the original amount of the loan—being due at the end of a stated five-year loan term, which was December 11, 2018.

55. The Loan provided for monthly, interest-only payments of $650.

56. On a residential mortgage loan with a bona fide principal of $39,773, originated on December 11, 2013, the maximum monthly interest that could be legally charged—at an annual APR of 5.75%—would have been $190.58.

57. In order to further ensure that the principal would never be reduced, the Loan prohibits any payments from being applied to the principal unless such payments are made "in minimum increments of $10,000."

58. These two loan terms—the interest-only payment schedule and the prohibition of principal payments less than $10,000—functioned together effectively to trap Ms. Parkin in an egregiously predatory mortgage and ensure that the loan balance at maturity would remain unchanged, forcing Ms. Parkin either to renew the loan continuously or lose her house.

59. While these predatory terms could be surmised by a careful reading of the loan documents by a sophisticated reader, Defendants failed to provide Ms. Parkin with any of the legally mandated disclosures that are designed to make important loan terms understandable for the

average consumer, on the basis of its false and fraudulent characterization of the Loan as having a business, rather than consumer, purpose.

60. Among the Truth in Lending disclosures that Ms. Parking was wrongfully denied, were disclosures providing,

    a. "the total of payments, using that term, and a descriptive explanation such as 'the amount you will have paid when you have made all scheduled payments', as required by TILA. *See* 15 U.S.C. § 1638(a)(5) and 12 CFR 1026.18(h);

    b. an "interest rate and payment summary" in the form of a table substantially similar to Model Clause H-4(H), regarding "Fixed Rate Mortgage with Interest Only," and failed to label the amount applied to only accrued interest as "interest payment" with "a statement that none of the payment is being applied to principal," as required by TILA. *See* 15 U.S.C. § 1638(a)(6) and 12 CFR 1026.18(s)(1);

    c. a disclosure that the monthly payments would only be applied to interest, and would not reduce the principal, including by failing to specifically disclose that "none of the payment is being applied to principal," as required by TILA. *See* 12 C.F.R. § 1026.18(s)(3)(ii);

    d. that the loan required Ms. Parkin to repay the principal balance in a single balloon payment of $60,000 at the end of the loan term, and prohibited her from making any payments towards principal unless those principal payments were made in minimum increments of at least $10,000, as required by TILA. *See* 12 CFR 1026.18(s)(5).

61. Another predatory feature of the Loan was the inclusion of an illegal confession of judgment clause.

62. Defendants conducted no due diligence into the capacity of either Mr. Steers or of Ms. Parkin to be able to make the necessary payments on the loan.

63. At the time that the loan documents were signed, Defendants understood or should have understood that, with all likelihood, neither Mr. Steers nor Ms. Parkin would have the ability to make the required lump sum balloon payment of $60,000 when it became due in December 2018.

64. After approximately a year or two, Mr. Steers fell behind in making the required $650/mo. payments. Once this occurred, Defendant Mark Clemm demanded that Ms. Parkin make payments on the Loan.

65. In order to protect the house, Ms. Parkin began making the $650 monthly payments out of her fixed income. Owing to Ms. Parkin's age, Plaintiff Lindsay became closely involved with helping her make and deliver the payments.

66. On July 20, 2016, Defendant Katie Clemm sent a letter to Mr. Steers and Ms. Lindsay, copying Ms. Parkin, written on WCT letterhead, imposing a late fee of $32.50 for being eight days late on the July 2016 payment.

67. On July 26, 2016, Defendant Katie Clemm sent a letter to Mr. Steers and Ms. Lindsay, copying Ms. Parkin—this time written on KMC Associates letterhead—stating that the loan had been assigned to KMC Associates and instructing that future payments for the loan should be made to KMC Associates.

68. The Defendant Clemms eschewed the business formalities of assignment at that time, and did not actually notarize and record the assignment of the mortgage from WCT to KMC until September 2019, backdated to August 2016.

69. Shortly before the December 2018 expiration of the five-year loan term, Defendants demanded a lump sum payment of $60,000 from Ms. Parkin and threatened to file a foreclosure if she did not pay.

70. After Ms. Parkin communicated that she did not have $60,000, Defendants orally offered to "renew" the Loan for an additional four years and abstain from filing a foreclosure if Ms. Parkin would agree to continue making $650 monthly payments for another four years.

71. Having little choice, Ms. Parkin orally agreed to the "renewal" and to continue making monthly payments of $650.

72. When the term of the loan was orally extended in 2018, Ms. Parkin was 81-years old and had zero prospects of any increased income, nor did she operate or plan to operate any business.

73. The maximum allowable interest rate for residential mortgages originated in the month of December 2018, when Defendants orally renewed the Loan was still 5.75%. *See* 48 Pa. B. 7222 (Nov. 17, 2018).

74. In the Fall 2022, despite Ms. Parkin continuing to make monthly usurious interest payments, Defendant Mark Clemm went to Ms. Parkin's home and threatened to foreclose if she did not either pay the balloon payment of $60,000 or enter into a new mortgage loan.

75. When Ms. Parkin did not accept either of these alternatives, in December 2022 KMC Associates, represented by Clemm and Associates LLC, filed a mortgage foreclosure suit in the Pennsylvania Court of Common Pleas, Philadelphia County. *See KMC Associates LLC v. Gloria Parkin, Trustee Under Trust Dated January 8, 1975*, No. 221200273 (Pa. Comm. Pls., Phila. Cty.).

V.   **LEGAL CLAIMS**

### COUNT ONE (Against Defendants Mark and Katie Clemm)
### RICO, 18 U.S.C. § 1962(c) – Collection of Unlawful Debt

76. Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

77. At all relevant times, Defendants Mark and Katie Clemm and the business entities they controlled including Clemm and Associates LLC, WCT LLC, and KMC Associates LLC, engaged in the collection of unlawful debt.

78. The Clemms' Usurious Lending Enterprise, including its leadership, membership, and associates, constitutes an "enterprise" as that term is defined in 18 U.S.C. § 1961(4)—that is, a group of individuals and entities associated in fact. This association in fact shared a common purpose (the making of usurious loans secured by residential mortgages, collection of interest on those loans, and enforcement of those loans by the threat or reality of mortgage foreclosure actions); relationships among those associated (all owned and operated by Defendants Mark and Katie Clemm); and a longevity sufficient to make the mortgage at issue, collect upon it, and file to foreclose it.

79. The enterprise has been engaged in, and its activities affected, interstate commerce. Defendants regularly use the mail and wires to conduct the Clemms' Usurious Lending Enterprise.

80. The Clemms' Usurious Lending Enterprise constitutes an ongoing organization whose members function as a continuing unit for a common purpose of achieving the objectives of the enterprise.

81. The Clemms' Usurious Lending Enterprise has been led, controlled, and/or managed by Defendants Mark and Katie Clemm and the purpose of the said enterprise was and continues to be the enrichment of the said Defendants through the collection of unlawful debt.

82. RICO defines an "unlawful debt" as debt incurred in connection with "the business of lending money or a thing of value at a usurious rate under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

83. The means and methods by which the Defendants conducted and participated in the conduct of the affairs of the Clemms' Usurious Lending Enterprise was the operation, direction, and

control of a business of lending money at usurious rates more than two times the legal limit in Pennsylvania.

84. During the four years preceding the commencement of this action, from February 3, 2020 through December 1, 2022, Ms. Parkin made payments to Defendants totaling $23,372.50 on this interest-only loan.

85. Because the maximum permissible interest on a bona fide principal of $39,773 was $2,286.95/year, or $190.58/month, the maximum amount of interest she paid during this period should not have exceeded $6,670.30.

86. Therefore, during this period Defendants collected $16,702.20 ($23,373.50-$6,670.30) more from Ms. Parkin than the Pennsylvania interest law allows.

87. The said Defendants have violated RICO through the "collection of unlawful debt," as that term is defined in RICO, 18 U.S.C. § 1962(c), from Ms. Gloria Parkin, in the amount of $16,702.20.

88. As a result of the unlawful collection of illegal debt, the heirs of Gloria Parkin, represented by Plaintiff Sharon Lindsay, as Administratrix of the Estate of Gloria M. Parkin, have been injured in this amount.

89. As a direct and proximate cause of the Defendants' violations of RICO, they are jointly and severally liable to Plaintiff for actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### COUNT TWO (Against All Defendants)
### RICO, 18 U.S.C. § 1962(d) – RICO Conspiracy

90. Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

91. As described above, the persons and entities making up the Clemms' Usurious Lending Enterprise constitute an association-in-fact "enterprise," as defined in 18 U.S.C. § 1961(4).

92. The conduct of Defendants Mark and Katie Clemm, and Defendant Clemm and Associates LLC, with knowledge, agreeing to support and assist, and in fact, supporting and assisting the illegal loan business described above, violated 18 U.S.C. § 1962(d).

93. As a result of this violation of RICO, Defendants are jointly and severally liable to Plaintiff for all the damages caused by the Clemms' Usurious Lending Enterprise, including for their actual damages of $16,702.20, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### COUNT THREE (Against Defendants Mark and Katie Clemm)
**Pennsylvania Fair Credit Extension and Uniformity Act,
73 P.S. §§ 2270.1 *et seq.***

94. Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

95. The Defendants Mark Clemm and Katie Clemm are "debt collectors" under the Pennsylvania Fair Credit Extension Uniformity Act ("PFCEUA"), 73 P.S. § 2270.3, in that each is a "person not a creditor conducting business within this Commonwealth, acting on behalf of a creditor, engaging or aiding directly or indirectly in collecting a debt owed or alleged to be owed a creditor or assignee of a creditor."

96. During the two years preceding the commencement of this action, the Defendants have, in concert with one another, and with each other's awareness and consent, directed written collection communications to Ms. Parkin—and to Plaintiff Lindsay, as well—for the purpose of exerting pressure on them to make payments on the Loan. These include the following:

   a. A letter from Defendant Katie Clemm, on the letterhead of KMC Associates, dated March 14, 2022, demanding the March payment and a late charge;

   b. A letter from Defendant Katie Clemm, on the letterhead of KMC Associates, dated April 18, 2022, demanding the April payment and two late charges;

16

    c. A letter from Defendant Katie Clemm on the letterhead of KMC Associates, dated May 13, 2022, demanding the May payment;

    d. A letter from Defendant Katie Clemm on the letterhead of KMC Associates, dated June 13, 2022, demanding the May and June payments and threatening foreclosure and the imposition of foreclosure costs;

    e. A letter from Defendant Katie Clemm on the letterhead of KMC Associates, dated July 11, 2022, demanding the June and July payments and threatening foreclosure and the imposition of foreclosure costs if payment not received within ten days;

    f. A second letter from Defendant Katie Clemm on July 11, 2022, stating that the $60,000 balloon payment will be due on December 11, 2022;

    g. A letter from Defendant Katie Clemm on the letterhead of KMC Associates, dated August 11, 2022, demanding the August payment and again threatening foreclosure and the imposition of foreclosure costs;

    h. A letter from Defendant Katie Clemm on the letterhead of KMC Associates, dated August 19, 2022, confirming receipt of the July and August payments but stating that late charges are still due and owing and demanding that Ms. Parkin agree to enter into a new loan prior to the balloon payment coming due.

97. On or about August 22, 2022, one of the Defendants called Ms. Parkin to demand that she either pay the $60,000 Loan principal or enter into a new agreement extending the term of the Loan, or, if she did neither, that she would face foreclosure.

98. On November 15, 2022, Defendant Mark Clemm came to the property with a notary with paperwork to complete the loan extension previously demanded, but Ms. Parkin refused to sign.

99. On November 22, 2022, Defendant Katie Clemm mailed what purported to be a pre-foreclosure letter to Ms. Parkin, threatening to file a foreclosure within ten days.

100. Under the FCEUA, it is an "unfair or deceptive debt collection act or practice" for a debt collector to violate any provision of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. 73 Pa. Stat. Ann. § 2270.4.

101. The above-mentioned communications violated 15 U.S.C. § 1692e(2)(A) by falsely representing the illegal interest imposed by the Loan as being legally due and owing, by falsely characterizing the debt as a business loan, and otherwise misrepresenting the "character, amount, or legal status" of the debt.

102. The above-mentioned communications violated 15 U.S.C. § 1692e(5), as a "threat to take any action that cannot legally be taken," in that a foreclosure action cannot be legally commenced in Pennsylvania without complying with the 30-day notice requirements of Pennsylvania Act 91, 35 Pa. Stat. Ann. §1680.401c *et seq.*

103. Ms. Parkin made payments totaling $6,050 as a result of these communications.

104. The collection of these payments independently violated 15 U.S.C. § 1692f(1) because they were for interest, fees or other charges prohibited by Pennsylvania law.

105. Violations of the PFCEUA are enforceable through the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Stat. Ann. (West) § 201-9.2. *See* 73 Pa. Stat. Ann. (West), 2270.5(a).

106. Plaintiff is entitled to actual damages, treble damages and attorneys' fees and costs for this violation.

## VI. RELIEF SOUGHT

WHEREFORE, Plaintiff requests the following relief:

A. That the Court hold Defendants jointly and severally liable for the injuries caused by their illegal conduct and award Plaintiff actual damages of monies paid;

B. That the Court award Plaintiff treble damages;

C. That the Court award Plaintiff pre- and post-judgment interest on any recovery;

D. That the Court award Plaintiff her costs of suit, including reasonable attorneys' fees and expenses;

E. That the Court award such other relief as the Court may deem just and proper.

                                    Respectfully submitted,

Date: February 1, 2024                                 /s/ *David Nagdeman*
                                                        LANGER, GROGAN & DIVER P.C.
                                                        David Nagdeman, Esq.
                                                        PA Bar No. 327652
                                                        dnagdeman@langergrogan.com
                                                        Irv Ackelsberg, Esq.
                                                        PA Bar No. 23813
                                                        iackelsberg@langergrogan.com
                                                        1717 Arch St., Ste 4020
                                                        Philadelphia, PA 19103
                                                        (215) 320-5660
                                                        *Attorneys for Sharon Lindsay as Administratrix of the Estate of Gloria M. Parkin*